IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

| | |
|---|---|
| **JAMES RANDALL PETRY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )   **CIVIL ACTION NO. 2:13-32835** |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

**M E M O R A N D U M   O P I N I O N**

This is an action seeking review of the decision of the Commissioner of Social Security denying Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is presently pending before the Court on the Parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 13 and 14.) Both parties have consented in writing to a decision by the United States Magistrate Judge. (Document Nos. 4 and 6.)

The Plaintiff, James Randall Petry (hereinafter referred to as "Claimant"), filed applications for DIB and SSI on February 14, 2011 (protective filing date), alleging disability as of December 10, 2010, due to "congestive heart failure, open heart surgery, heart blockages, lower back pain, kidney issues, high blood pressure, diabetes, and arthritis in left shoulder."[1] (Tr. at 13, 154-57, 158-64, 202,

---

[1] On his form Disability Report - Appeal, dated July 18, 2011, Claimant alleged the following additional disabling impairments:

> [I]nability to process information like used to, short of breath upon exertion, diminished concentration and focus, trouble completing tasks, trouble walking due to shortness of breath, trouble with left shoulder, limited motion, [and] pain."

(Tr. at 246.) He further asserted that his

207.) The claims were denied initially and upon reconsideration. (Tr. at 13, 82-85, 86-88, 91-93, 100-02, 104-06, 107-09, 111-13.) On October 6, 2011, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 114-15.) The hearing was held on July 16, 2012, before the Honorable Sabrina M. Tilley. (Tr. at 50-81.) By decision dated August 17, 2012, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 13-32.) The ALJ's decision became the final decision of the Commissioner on October 16, 2013, when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.) On December 20, 2013, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2012). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third

---

nerves are worse, trouble with sleep, cannot process information the way could before had surgery, shortness of breath, diminished concentration, even way he walks seems different, i.e. gait not the way it used to be, easily fatigued, anxiety and depression a lot of the time, will sit in front of TV for an hour just thinking, being depressed before even turns TV on, nothing is the same, extremely short of breath upon any exertion.

(*Id.*)

2

inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2012). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and

>available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
>(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
>(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
>(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause

4

deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2) (2012).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since December 10, 2010, the alleged onset date. (Tr. at 15, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "Coronary Artery Disease; Coronary Artery Bypass Grafting (CABG) x2; Left Shoulder Impingement Syndrome; Diabetes Mellitus; Obesity; Borderline Intellectual Functioning; Depression; and Anxiety," which were severe impairments. (Tr. at 15, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 19, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity to perform

---

decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

light exertional level work, as follows:

> [T]he [C]laimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). He can lift 20 pounds occasionally, 10 pounds frequently with the dominant right arm and up to 10 pounds with the left arm. He can occasionally climb ramps and stairs, balance, stoop, kneel, crouch or crawl, but may never climb ladders, ropes or scaffolds. He is limited to no overhead reaching with the left shoulder. He should avoid concentrated exposure to extreme heat, cold, wetness, vibration and respiratory irritants including fumes, odors, dusts, gases and poor ventilation as well as hazards such as moving machinery and unprotected heights. He is limited to simple, routine and repetitive work requiring concentration for up to 2-hour intervals, with superficial interaction with coworkers, supervisors and the general public.

(Tr. at 22, Finding No. 5.) At step four, the ALJ found that Claimant was unable to perform his past relevant work. (Tr. at 30, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a basket filler, night cleaner, and hand packer, at the unskilled, light level of exertion. (Tr. at 30-32, Finding No. 10.) On this basis, benefits were denied. (Tr. at 32, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch,

495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Claimant's Background

Claimant was born on December 20, 1963, and was 48 years old at the time of the administrative hearing, July 16, 2012. (Tr. at 30, 56, 154, 158.) Claimant had a limited education and was able to communicate in English. (Tr. at 30, 56, 206, 208 ). Claimant had past relevant work as a sign maker helper, pole setter, and coal truck driver. (Tr. at 30, 72, 208, 215-22.)

Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

Claimant first alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to find that his neck pain and degenerative disc disease of the cervical spine were severe impairments. (Document No. 13 at 2-3.) In support of his allegation, Claimant asserts that the medical evidence demonstrated his inability to move his head from left to right, which significantly interfered with his ability to perform basic work activities. (Id.) Evidence from Charleston Area Medical Center ("CAMC") in December 2009, and Dr. Legg on November 11, 2011, evidenced complaints of left shoulder pain with radiation into his neck accompanied by spasms and limited ranges of motion. (Id.) The pain was aggravated by neck motion to the left and right. (Id. at 3.) Claimant's testimony further evidenced headaches that occurred two or three times per month and lasted three to four days or a week. (Id.) Claimant therefore contends that such evidence demonstrates severe impairments of the neck and cervical spine. (Id.)

In response, the Commissioner initially asserts that where the ALJ finds at least one severe impairment, his failure to consider whether any other impairment is severe is harmless error. (Document No. 14 at 5-6.) Notwithstanding this assertion, the Commissioner asserts that substantial evidence supports the ALJ's finding that Claimant's neck impairment was non-severe. (Id. at 5.) The Commissioner notes that January 2011, and May 2012, physical examinations were unremarkable and that Claimant failed to report any neck pain to Dr. Beard in June 2011. (Id.) Dr. Beard's examination also was unremarkable. (Id.) Additionally, Claimant failed to allege any neck pain or corresponding functional limitations on two questionnaires submitted to the State agency. (Id.) Finally, the Commissioner asserts that even if Claimant's neck impairment was severe, the ALJ's failure to make such a finding was inconsequential because Claimant failed to demonstrate harm from such failure. (Id. at 6.) Thus, the Commissioner contends that Claimant has not demonstrated any functional limitations from his neck pain that would have precluded him from performing the jobs identified by the VE. (Id.)

Claimant next alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in failing to find that he met Listing 12.05C. (Document No. 13 at 3-5.) Claimant asserts that the ALJ failed to provide an appropriate analysis of his mental impairments in that he failed to document her analysis to support her finding that Claimant had no deficits in adaptive functioning. (Id. at 4.) Claimant also alleges that the ALJ failed to mention his school records or Ms. Salamacha's report in her 12.05C analysis. (Id.) His school records reflected attendance through the tenth grade, with primarily failing grades. (Id.) At the age of 14, his full scale IQ score was 70, in the sixth grade his basic skills were below the level expected, and when he was in the eighth grade, his abilities were further below expected levels. (Id. at 4-5.) Ms. Salmacha's evaluation revealed that Claimant exhibited behavioral problems when in school and maintained many various jobs as an adult.

8

(Id. at 5.) Testing revealed a verbal IQ score of 66 and an ability to read and spell at the fifth grade level and perform math at the fourth grade level. (Id.) Ms. Salmacha opined that Claimant's scores were consistent with his then current assessed intellectual functioning level in the borderline range. (Id.) Claimant therefore contends that the record established that he had adaptive deficits in functioning prior to the age of 22. (Id.)

In response, the Commissioner asserts that substantial evidence supports the ALJ's finding that Claimant's impairments did not meet or equal Listing 12.05C. (Document No. 14 at 6-11.) The Commissioner asserts that regarding the deficits in adaptive functioning, Claimant failed to report any problems with personal care of activities of daily living resulting from psychological symptoms or limitations. (Id. at 9.) The Commissioner notes that Claimant lived alone, had a driver's license, drove a car, shopped, and prepared meals. (Id.) Additionally, he had an extensive work history. (Id.) Furthermore, the Commissioner asserts that Claimant never was diagnosed with mental retardation, despite his IQ scores. (Id. at 10.) The Commissioner contends that because Claimant was in the borderline range of intelligence, such evidence constitutes substantial evidence that he did not demonstrate deficits in adaptive functioning. (Id.) The Commissioner further asserts that despite Claimant's faulting the ALJ for not discussing specifically the evidence relating to the 12.05C analysis, the ALJ was not required to use any particular language in her analysis. (Id. at 11.) Accordingly, the Commissioner contends that Claimant does not meet Listing 12.05C. (Id.)

Claimant further alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in giving little weight to the opinion of Laberta Salamacha, M.A., a licensed psychologist. (Document No. 13 at 5-7.) Claimant asserts that Ms. Salamacha's opinions are supported by her own testing and Claimant's longstanding history of intellectual, behavioral, and emotional difficulties. (Id. at 7.)

9

In response, the Commissioner asserts that the ALJ properly evaluated Ms. Salamacha's opinion. (Document No. 14 at 11-13.) The Commissioner asserts that Ms. Salamacha was not a treating source, and therefore, her opinion was not entitled controlling weight. (Id. at 12.) Furthermore, the Commissioner asserts that the ALJ properly discounted Ms. Salamacha's opinion because it was not accompanied by any explanation and inconsistent with the objective evidence of record, Claimant's limited treatment history, and his reported activities of daily living. (Id.) The Commissioner also noted that Claimant reported to his primary care provider that he was doing well, had less depression with medication, and was compliant with his medications. (Id.) This evidence conflicts with Claimant's report to Ms. Salamacha the next day that he had significant symptoms. (Id.) Finally, the Commissioner notes that Claimant never sought nor received any psychological treatment outside his primary care provider. (Id. at 13.) Thus, the Commissioner contends that the ALJ properly discounted Ms. Salamacha's opinion. (Id.)

Finally, Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to consider all of his limitations resulting from his neck impairment when assessing Claimant's RFC. (Document No. 13 at 7-8.) Claimant notes that he testified that he had constant, sharp pain which worsened with movement, particularly to the left or right, or when looking down. (Id. at 8.) Despite these reported limitations, Claimant contends that the ALJ failed to incorporate the neck limitations in her RFC analysis. (Id.)

In response, the Commissioner asserts that the evidence did not establish any psychical or mental limitations from Claimant's impairments beyond those already incorporated in the RFC assessment. (Document No. 14 at 13-15.) Accordingly, because the ALJ accounted for all the credibly established limitations in the RFC assessment, the Commissioner contends that the ALJ's RFC assessment is supported by substantial evidence. (Id. at 15.)

Analysis.

Listing 12.05C

Addressing Claimant's allegations out of turn, the Court first considers Claimant's complaint that the ALJ erred in determining whether his mental impairments satisfied Listing 12.05C. (Document No. 13 at 3-5.) "The Listing of Impairments describes, for each of the major body systems, impairments that are considered severe enough to prevent an adult from doing any gainful activity," regardless of age, education or work experience, see Sullivan v. Zebley, 493 U.S. 521, 532, 110 S.Ct. 885, 892, 107 L.Ed.2d 967 (1990); 20 C.F.R § 416.925(a) (2011). Section 12.05 of the Listing of Impairments provides criteria for determining whether an individual is disabled by mental retardation or autism. "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (2012). The required level of severity for Listing § 12.05 is satisfied when any one of the four following requirements is satisfied:

> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
>
> OR
>
> B. A valid verbal, performance, or full scale IQ of 59 or less;
>
> OR
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
>
> OR
> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

      1. Marked restriction of activities of daily living; or
      2. Marked difficulties in maintaining social functioning; or
      3. Marked difficulties in maintaining concentration, persistence, or pace; or
      4. Repeated episodes of decompensation, each of extended duration.

To meet the criteria of § 12.05C, Claimant must show "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C (2012). The Fourth Circuit has held that a claimant's additional "severe" impairment qualifies as a significant work-related limitation for the purpose of listing § 12.05C. Luckey v. United States Dep't of Health & Human Serv., 890 F.2d 666 (4th Cir. 1989) (per curiam). A "severe" impairment is one "which significantly limits [one's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c); 416.920(c) (2012). In Luckey, the Court ruled that:

> Luckey's inability to perform his prior relevant work alone established the significant work-related limitation of function requirement of section 12.05C. Further, the Secretary has defined a severe impairment or combination of impairments as those which significantly limit an individual's physical or mental ability to do basic work activities. The Secretary's finding that Luckey suffers from a severe combination of impairments also establishes the second prong of section 12.05C.

Id. at 669 (internal citations omitted).

As described in the introduction to the Listing, and as stated by the ALJ, one of the essential features of mental retardation is significant deficits in adaptive functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00; See also The Merck Manual of Diagnosis and Therapy 3044 (Mark H. Beers, M.D. & Robert S. Porter, M.D., eds., 19th ed. 2011) (defining mental retardation, now referred to as "intellectual disability," as "significantly subaverage intellectual functioning (often expressed as an intelligent quotient < 70 to 75) combined with limitations of > 2 of the following: communication, self-direction, social skills, self-care, use of community resources, and maintenance

of personal safety. Management consists of education, family counseling, and social support).[3] Also, according to the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, (DSM-IV)(1994), one of the essential features of mental retardation is significant deficits in adaptive functioning. Id. at 39-40. Adaptive functioning refers to how effectively an individual copes with common life demands and how well she meets the standards of personal independence expected of someone in his particular age group, sociocultural background, and community setting. Id. at 40. The Regulations make clear that Listing § 12.05C is a three-part test. The Introduction to section 12.00 of the Listings, section 12.00A, was revised in 2000 to state as follows:

> The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A; 65 Fed. Reg. 50, 746, 50, 776; see also Foster v. Halter, 279 F.3d 348, 354 (6th Cir. 2001) (detailing change).

In her decision, the ALJ considered Claimant's mental impairments under Listings §§ 12.02, 12.04, 12.05, and 12.06, and found that he failed to meet or equal any Listing. (Tr. at 20-22.) In considering Listing 12.05C, the ALJ concluded that Claimant failed to meet the Listing because he did not have a verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. (Id. at 22.) She noted that his IQ scores ranged from 66 to 74 and that his current diagnosis was borderline

---

[3] "In 1992 the American Medical Association on Mental Retardation changed the definition of mental retardation to reflect adaptation to the environment and interaction with others by a person with limited intellectual functioning. Classification based on IQ alone (mild, 52 to 68; moderate, 36 to 51, severe, 20 to 35; profound, less than 20) has been replaced to that based on level of support needed." *The Merck Manual of Diagnosis and Therapy* 2259 (Mark H. Beers, M.D. & Robert Berkow, M.D., eds., 17th ed. 1999).

intellectual functioning. (Id.) Regarding deficits in adaptive functioning, the ALJ concluded that Claimant did not meet the requirement because he had an extensive work history and was independent in most activities of daily living. (Id.)

The Court finds that the ALJ failed to conduct the type of adaptive functioning analysis required by Listing 12.05. Adaptive functioning "refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." DSM-IV at 42. The determination of whether Claimant demonstrated deficits in adaptive functioning that manifested prior to the age of 22, required the ALJ to perform a fact-specific inquiry. The ALJ failed to discuss Claimant's academic performance. Although the ALJ noted that Claimant did not receive special education services in school, she failed to note that Claimant was kicked out of school in the tenth grade, was kicked out of school on more than one occasion, had a lot of behavioral problems, received below average and failing grades in school, and received Verbal IQ scores of 30, Performance IQ scores of 40, and Full Scale IQ scores of 70, in 1978, when he was 14 years of age. (Tr. at 192-201.) Thus, the ALJ failed to consider whether any adaptive deficits manifested prior to the age of 22. Although Claimant had IQ scores as an adult, the ALJ failed to reconcile them with his childhood scores. She properly noted that Claimant had an extensive work history and somewhat was independent in activities of daily living. Claimant reported some difficulties putting on shoes and socks, but reported that he prepared only "easy" foods and that his mother and friends helped with the house and yard work and that his mother shopped for him. (Tr. at 228-36.) On a further form Function Report, however, Claimant indicated that he was more independent in household chores and shopping. (Tr. at 257-64.)

An ALJ has a duty to identify the relevant listed impairments and compare each of the listed criteria to the evidence of the claimant's symptoms. See Cook v. Heckler, 783 F.2d 1168, 1172 (4th

Cir. 1986). Without such an explanation, it is impossible for a reviewing court to determine whether there was substantial evidence to support the ALJ's decision. Cook, 783 F.2d at 1173. This rule, however, is not inflexible requiring discussion of each listing, point-by-point. The duty of explanation has said to be triggered when "there is ample evidence in the record to support a determination that the claimant's impairment meets or equals one of the listed impairments." Ketcher v. Apfel, 68 F.Supp.2d 629, 645 (D.Md. 1999). Nevertheless, in view of the foregoing, the Court finds that the ALJ failed to perform the requisite adaptive functioning analysis contemplated by Listing 12.05C. Accordingly, the Court finds that remand is necessary for further consideration of Listing 12.05C.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is not supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings (Document No. 13.) is **GRANTED**, Defendant's Motion for Judgment on the Pleadings (Document No. 14.) is **DENIED**, the final decision of the Commissioner is **REVERSED**, and this matter is **REMANDED** to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings and is **DISMISSED** from the active docket of this Court.

.	The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

ENTER: September 30, 2015.

R. Clarke VanDervort
United States Magistrate Judge